## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

ROBERT WILLIAMSON,                )
                                  )
          Petitioner,             )
                                  )
vs.                               )          Case No.  CIV-13-899-D
                                  )
DAVID PARKER,                     )
                                  )
          Respondent.             )

## REPORT AND RECOMMENDATION

Petitioner, appearing through counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Doc. 16. United States District Court Judge Timothy D. DeGiusti has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). Respondent has filed a response, Doc. 18, with the pre-trial (PTR) and trial transcripts (TR), the original record (OR), and the supplemental original record (Supp. OR). For the reasons set forth below, the undersigned recommends that the court deny habeas relief.

## I.    Introduction.

In Oklahoma County, Oklahoma, Case No. CF-2009-1093, a jury convicted Petitioner of lewd molestation in Counts 1, 3, and 4, and acquitted him of the same in Count 2. TR Vol. 7, at 916-17. Petitioner appealed, and

the Oklahoma Court of Criminal Appeals (OCCA) affirmed his convictions. Doc. 18, Ex. 5, at 1-7.[1]

## II.   Petitioner's claims.

Petitioner alleges that he is entitled to habeas relief based on: (1) improper propensity evidence; (2) fundamental unfairness through the state court's evidentiary rulings; (3) ineffective assistance of counsel; and (4) insufficient evidence. Doc. 16, at 5; Doc. 22, Att. 1, at 7-46.[2]

## III.   The probative evidence at trial.

Petitioner's wife, Amber Williamson, testified that in November 2008 she and her two minor children were living with Petitioner. TR Vol. 3, at 249-50. On November 18, 2008, Ms. Williamson came home unannounced and

---

[1]   The undersigned's page citations refer to the court's CM/ECF pagination.

[2]   First appearing pro se, Petitioner filed a writ of habeas corpus with a "Memorandum of Argument and Authorities" attached. Doc. 1, Att. 2. Judge DeGiusti dismissed the petition as containing both unexhausted and exhausted claims, Doc. 15, and Petitioner, through counsel, filed an amended petition dropping the unexhausted claim. Doc. 16. The amended petition refers to an "attached Memorandum" for argument in support, but no document is attached. *Id.* Upon the court's inquiry, Doc. 21, Petitioner's counsel explained that the memorandum's omission was inadvertent and clarified that Petitioner intends to rely on the original "Memorandum of Argument and Authorities," minus the briefing on the unexhausted claim. Doc. 22. Counsel attached the original memorandum to his response to the court's order, *id.* Att. 1, and the undersigned cites to it there.

overheard Petitioner speaking in a "lower tone" voice, which she associated with his "seductive-sounding-type tone." *Id.* at 263, 267-69. Ms. Williamson suspected that Petitioner was "on the phone with . . . another woman," and as she approached the master bedroom, she heard Petitioner say in a "low seductive voice," "'Are you touching it? Do you like it? Does it feel good?'" *Id.* at 269. According to Ms. Williamson, Petitioner would make these same comments to her when they engaged in sexual intercourse. *Id.* at 314.

Ms. Williamson told the jury that she "opened up the [bedroom] door abruptly," and Petitioner walked out of the connecting bathroom looking "shocked" and "surprised." *Id.* at 269, 271. Petitioner did not have a phone in his hand, and Ms. Williamson walked around Petitioner and "saw [her seven-year-old] daughter in the bathtub." *Id.* at 271-72. Ms. Williamson testified that she began screaming at Petitioner, asking him if he had been talking to her daughter. *Id.* at 272-73.

During the argument, Ms. Williamson's daughter, B.M., left the bathroom and returned to her room. *Id.* at 275-76; *id.* Vol. 2, at 103. Ms. Williamson testified that she found B.M. there and asked, "'[H]as [Petitioner] ever done anything to you that he's not supposed to do?'" *Id.* Vol. 3, at 277. B.M. responded, "'Well, he grabbed my bottom a lot today,'" and Ms. Williamson asked, "Was it your butt or your bottom?" *Id.* Ms. Williamson

testified that "bottom" referred to B.M.'s vaginal area. *Id.* In response, B.M. stated that Petitioner had been grabbing her "butt." *Id.* Then, without any further questioning, B.M. told her mother, "He's been showing me his penis." *Id.* at 278.

Ms. Williamson testified that she immediately left the house with her son and B.M., *id.* at 278-82, and drove to the police station. *Id.* at 287. During the car ride, B.M. "lifted her hand up" and stated, "'He would do this [transcript indicates "up-and-down motion"] until the white stuff would come out.'" *Id.* at 284. Ms. Williamson asked B.M. how long it had been going on, and B.M. replied, "At least a couple of months." *Id.* at 284-85. Ms. Williamson explained that pursuant to police instructions, she did not thereafter initiate any discussions about Petitioner's conduct with her daughter. *Id.* at 296. About six weeks later, during a car ride to a counseling session, B.M. initiated a conversation with Ms. Williamson: "I'm going to tell you something . . . but I don't want you to look at me." *Id.* at 299. B.M. then stated that Petitioner had shown her a videotape that he and Ms. Williamson had made of themselves having sexual intercourse, and he had also shown her pictures of "a little girl . . . with the man's penis in the girl's mouth." *Id.* at 299-300. B.M. also said, "[Petitioner] told me that one morning, Mommy, when you were going to work that you were on the other

4

side of the house and that you came into the bedroom and that you went and put [his] penis in your mouth and that you sucked on it." *Id.* at 301. Ms. Williamson testified that these comments were significant to her because she and Petitioner had recorded themselves having sex, and she had performed oral sex on Petitioner one morning before she went to work. *Id.* at 301-02, 314-15.

During the same car ride, B.M. also stated, "[Petitioner] licked my bottom and I would cry and he would ask me why I was crying." *Id.* at 301-02. Ms. Williamson testified that she believed B.M. was referring to her vaginal area when she said "bottom." *Id.* B.M. also told her mother that Petitioner had "stuck his tongue in her mouth and that she thought it was very gross and he would try to kiss her like that and stick his tongue in her mouth." *Id.* at 303. B.M. said that Petitioner would "keep asking her to put his penis in her mouth and when she didn't want to do that, . . . he ended up grounding her . . . ." *Id.* Ms. Williamson testified that while B.M. made these statements, her daughter was "shaking" and "really nervous." *Id.* at 300.

Thereafter, B.M. again made unsolicited statements to Ms. Williamson. "[Petitioner] stuck my mouth in his penis," B.M. stated. *Id.* at 305. Ms. Williamson asked, "'You mean, [Petitioner] stuck his penis in your mouth?'"

*Id.* "Yes," B.M. replied. *Id.* B.M. also told Ms. Williamson that Petitioner had once asked her to "pull my pants out where he could look down them and he just said ah that's beautiful." *Id.* at 306. Ms. Williamson testified that "those are the kind of things that he would say to me." *Id.*

Ms. Williamson further testified that one evening B.M. said that Petitioner had told her to "take a pen and practice." *Id.* When Ms. Williamson asked her to explain, B.M. "pointed back toward her bottom." *Id.* at 307. Again, this had significance to Ms. Williamson because Petitioner had once told her that she "needed to practice with a Corona bottle," by "put[ting] the bottle . . . inside [herself]." *Id.*

Finally, Ms. Williamson recalled that B.M. had once seen a lubricant bottle in a bathroom drawer and had asked about it. *Id.* at 313. After the events of November 18, 2008, B.M. told her mother that she had asked about it because "'that was the stuff that [Petitioner] would use with me.'" *Id.* at 314.

Latrenda Sanders at the Child Abuse Response and Evaluation (CARE) Center conducted a forensic interview with B.M. on November 24, 2008. *Id.* Vol. 5, at 393, 395, 403-04. Ms. Sanders videotaped that interview, and the State played it for the jury. *Id.* at 408. During the interview, B.M. stated

that Petitioner: (1) "showed me his penis";[3] (2) "made me touch his penis";[4] and (3) "wanted me to put it in my mouth."[5] B.M. stated that this had happened "a bunch of times,"[6] and she explained that sometimes Petitioner's penis would be hard and sometimes it would be soft.[7] B.M. also described to Ms. Sanders an incident where Petitioner got "slippery stuff," like a "clear oil,"[8] and he would ask her to "do this" (video later shows B.M. explaining with an up-and-down motion with her hands),[9] and then "white stuff comes of out his penis."[10] B.M. said that Petitioner used the "slippery stuff" in her bedroom.[11] Finally, B.M. told Ms. Sanders that Petitioner "told me to never

---

[3]     State's Ex. 137 at 11:14:34-35, *see also id.* at 11:18:57-58, 11:22:35-36.

[4]     *Id.* at 11:18:00-01; *see also id.* at 11:19:03-04, 11:24:30-31.

[5]     *Id.* at 11:23:05-09.

[6]     *Id.* at 11:21:40-51.

[7]     *Id.* at 11:24:45-52.

[8]     *Id.* at 11:30:00-01.

[9]     *Id.* at 11:41:46-50.

[10]     *Id.* at 11:25:08-21, 11:29:46-11:30:16.

[11]     *Id.* at 11:30:43-11:39:00.

tell my Mom because she would freak out."[12]

B.M. also denied some conduct in the videotaped interview. For example, she stated that Petitioner had not ever put his penis in her mouth,[13] Petitioner had not ever touched her "privates,"[14] and she had never seen a picture or movie with people with their clothes off.[15] According to Ms. Sanders, this is not uncommon with young children, who tend to disclose in a "process" – in other words, most children are "not going to tell you everything that's happened to them right away." *Id.* at 419-20.

B.M.'s counselor, Amy Bowers, also testified. *Id.* at 478. Ms. Bowers told the jury that during counseling, B.M. "reported to me on a couple of occasions that [Petitioner] would make her put slippery stuff on his penis and on her hand and touch his penis until he ejaculated, until the white stuff is what she called it." *Id.* at 484. B.M. also told her that Petitioner "would show her pictures of naked women." *Id.* at 485.

---

[12]     *Id.* at 11:15:11-15; *see also id.* at 11:22:41-44.

[13]     *See id.* at 11:23:20-26.

[14]     *Id.* at 11:34:09-29.

[15]     *See id.* at 11:46:23-30.

This information was consistent with what B.M. told Maggie Johnson during her counseling intake interview. According to Ms. Johnson, B.M. stated that Petitioner "would come into the bathroom when she was bathing and question her about touching her vaginal area . . . ." *Id.* at 506. Ms. Johnson clarified for the jury that "vaginal area is my word" – B.M. "pointed or she indicated her vaginal area." *Id.* Ms. Johnson testified that B.M. described Petitioner "exposing his penis and frequently masturbating to ejaculation," "showing her pictures of naked people," and "lick[ing]" or "orally sodomiz[ing] her . . . in her bedroom." *Id.* B.M. also told Ms. Johnson that Petitioner had shown her pictures of "he and her mother having sex." *Id.* at 507.

After being "truth qualified," *id.* Vol. 2, at 81-90, B.M. also testified. B.M. first recounted the night of November 18, 2008, testifying that while she took a bath in Petitioner's bathroom, he "pulled down his pants and showed me his penis and he said, 'Did you touch it? Does it feel good?'" *Id.* at 101. She then explained that when her mother had asked if Petitioner "had been doing anything," she at first said no because Petitioner had told her not to tell her mother. B.M. stated, "I was scared at what would happen . . . ." *Id.* at 103; *see also id.* at 104-05. B.M. then described other incidents with Petitioner, stating that he would take her "into the bathroom and turn[] off

the lights" and would tell her "to kiss his body." *Id.* at 109. B.M. further stated that when she saw Petitioner's penis, it was "sometimes big and sometimes small," and it was both "soft and hard." *Id.* at 109-10. B.M. testified that she had seen it go "from being small to being big" when Petitioner "would make me put slippery stuff on my hands and then rub it up and down on his penis." *Id.* at 110. She described that act further, stating that Petitioner "would make me put [the slippery stuff] on my hands and then, like, go up and down on his penis." *Id.* at 117. B.M. testified that when she did that, Petitioner's penis "would grow" and "white stuff would come out." *Id.* B.M. said that Petitioner also "put [the slippery stuff] on [her] private part once." *Id.*; *see also id.* at 130.

According to B.M., Petitioner also frequently asked her to "[p]ut my mouth on his penis," and, on at least one occasion, Petitioner touched her mouth with his penis. *Id.* at 114-15. B.M. testified that when she refused to put Petitioner's penis inside her mouth, he would ground her from playing with her friends or toys. *Id.* B.M. further stated that Petitioner showed her "pictures with naked people in them" and "videos of him and my mom having sex." *Id.* at 119-21. B.M. told the jury that Petitioner had "told me to practice with a pen and put it up my private part." *Id.* at 139. Petitioner would also ask B.M. if she "want[ed] to learn more," and he said that when she got to

high school, B.M. would "be the smartest one in the classroom." *Id.* at 111. B.M. believed that Petitioner meant that she would know more about "sex." *Id.* at 112.

At the State's request, B.M. also identified a picture that she had drawn during therapy that depicts B.M. standing in Petitioner's bedroom asking if she can play at Julie's house. *Id.* at 125-26 & State's Ex. 1. Petitioner, who is drawn naked, says, "Yes. But you have to play with me first!" TR Vol. 2, at 126 & State's Ex. 1.

Petitioner also testified at trial. He told the jury that B.M. had been masturbating in the bathtub the night of November 18, 2008, and that he was "disgusted" and was trying "to correct her behavior." TR Vol. 6, at 639-40. In sum, Petitioner denied that he had ever touched B.M. inappropriately, shown her his penis, masturbated in front of her, shown her any videos, or licked her. *Id.* at 649. Petitioner's theory was that B.M. had found and watched his and Ms. Williamson's sex tapes, and B.M. was simply describing the acts she had seen in the video. *Id.* at 656-60; *see also id.* Vol. 7, at 874-76.

## IV. Standard of review for habeas relief.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). A petitioner is entitled to federal habeas relief only if that merits-based adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d). This standard "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal." *Harrington*, 131 S. Ct. at 786.

This Court first determines "whether the principle of federal law on which the petitioner's claim is based was clearly established by the Supreme Court at the time of the state court judgment." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006); *see also Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). Clearly established law consists of Supreme Court holdings in cases where the facts are similar to the facts in the petitioner's case. *See House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If clearly established federal law exists, this Court then considers whether the state court decision was contrary to or an unreasonable application of that clearly established federal law. *See Bland*, 459 F.3d at 1009.

> A decision is "contrary to" clearly established federal law . . . if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts . . . materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from the result reached by the Supreme Court.

*Id.* (quotations omitted) (alterations in original). "As a condition for obtaining federal habeas relief, . . . a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

## V.  Petitioner's request for an evidentiary hearing.

Before addressing Petitioner's claims for relief, the undersigned notes that Petitioner seeks an evidentiary hearing so that the court can "vigorously examine[]" and "review[]" the propensity evidence, and so that Petitioner may "fully explore" his claim that counsel was ineffective.  Doc. 22, Att. 1, at 17-18, 41-43.

The Supreme Court has recently clarified that "evidence introduced in federal court has no bearing on a § 2254(d)(1) review." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011).  So, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.*

The OCCA adjudicated Petitioner's claims on the merits, Doc. 18, Ex. 5, at 6, and this Court's review is thus limited to determining whether the state court's adjudication was reasonable under § 2254(d)(1).  As illustrated below, Petitioner has not overcome § 2254(d)(1)'s deference, so the undersigned recommends that the court deny Petitioner's request for an evidentiary hearing.  *See Sanchez v. Wyoming*, 577 F. App'x 883, 885 (10th Cir. 2014) (rejecting petitioner's claim that the district court improperly denied him an evidentiary hearing on his habeas petition, holding that:  "[T]he court appropriately limited its review to the record that was before the Wyoming Supreme Court.  And having found that § 2254(d) barred a grant of habeas relief, the district court also did not err in denying [petitioner] an evidentiary hearing under § 2254(e)(2).").

## VI.  Petitioner's claims implicating Oklahoma's constitution and state laws.

Petitioner appears to rely, in part, on the alleged violation of Oklahoma's constitution and state laws as grounds for habeas relief.  Doc. 22, Att. 1 *passim*.  But even if such violations occurred, they would not entitle Petitioner to federal habeas relief.  *See Davis v. Reynolds*, 890 F.2d 1105, 1109 n.3 (10th Cir. 1989) ("Alternative state claims, whether grounded in state statutes or the State Constitution, are not cognizable under 28 U.S.C. §

2254(a)"). Therefore, the undersigned recommends that the court deny any claim based solely on the violation of Oklahoma's constitution or laws.

## VII. Petitioner's claims implicating the Federal Constitution.

For the reasons discussed below, the undersigned also recommends that the court deny habeas relief on Petitioner's claims involving an alleged violation of the Federal Constitution.

### A. Petitioner's claims relating to propensity evidence.

As illustrated above, the State tried Petitioner on charges that he molested his young step-daughter. To that end, the State introduced "propensity" evidence that Petitioner had once engaged in lewd acts with T.W., his biological daughter. Specifically, T.W. testified that when she was "seven or eight," and old enough to bathe unaided, Petitioner continued to bathe her to the point that it made her uncomfortable. TR Vol. 5, at 572-74. More importantly, T.W. testified that Petitioner would give her "open mouth kiss[es]" and would "lick [her] face and neck." *Id.* at 574-75. T.W. explained that Petitioner's contact made her feel "[w]ierded out, just kind of like the baths and the kissing, it just [was] not normal." *Id.* at 578.

Based on this evidence, Petitioner seeks habeas relief on four related grounds, arguing that: (1) the propensity statute is unconstitutional; (2) the trial judge failed to properly examine the proposed evidence; (3) the evidence

was substantially prejudicial; and (4) the trial judge failed to properly instruct the jury on its consideration of propensity evidence. Doc. 22, Att. 1, at 7-24.[16] The OCCA rejected these arguments on appeal, Doc. 18, Ex. 5, at 2-3, and the undersigned finds that the decision was a reasonable application of Supreme Court law.

### 1. Clearly established law.

Generally, a petitioner's challenge to evidentiary admissions raises only state law questions. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Hooks*, 689 F.3d at 1180 ("Of course, federal habeas relief is not available to correct state law evidentiary errors." (quotations and citation omitted)). Thus, under clearly established law, Petitioner must show that the trial court's admission of propensity evidence "was so grossly prejudicial that it fatally infected the trial and denied [him] fundamental fairness . . . ." *See Hooks*, 689 F.3d at 1180 (quotations and citation omitted).

---

[16] Petitioner weaves his propensity-evidence arguments throughout multiple sections and subsections spanning eighteen pages. Doc. 22, Att. 1, at 7-24. The undersigned has combined some arguments for a more efficient analysis.

### 2. The constitutionality of Okla. Stat. tit. 12, § 2414.

Section 2414 of Title 12 of the Oklahoma's statutes allows the State to introduce evidence that a defendant accused of child molestation has previously committed an unrelated act of child molestation or lewd conduct with a child. *Id.* Petitioner claims that the statute is facially unconstitutional. Doc. 22, Att. 1, at 7-16.[17] Specifically, Petitioner argues that it "violates the long established principles of convicting individuals only of those crimes that are charged," and "the 'clear and convincing standard of evidence' establishes a presumption in favor of the State that is inconsistent with a defendant's 'presumption of innocence.'" *Id.* Att. 1, at 7-8, 14. On direct appeal, the OCCA rejected this claim on the merits, Doc. 18, Ex. 5, at 2-3 & n.3, and the undersigned recommends that the court deny relief.

---

[17]     On direct appeal, Petitioner's attorney challenged Okla. Stat. tit. 12, § 2413, which is nearly identical to § 2414, but allows evidence that a defendant accused of sexual assault has previously committed an unrelated sexual assault. Doc. 18, Ex. 1; *see also* Okla. Stat. tit. 12, § 2413. The OCCA noted that Petitioner was actually challenging § 2414, Doc. 18, Ex. 5, at n.3, and Petitioner did not disagree. Here, Petitioner again cites to § 2413 rather than § 2414. Doc. 22, Att. 1, at 7-16. Because he was proceeding pro se at the time he filed his habeas brief, *see supra*, at n.2, the undersigned construes the argument as arising under the proper statute – Okla. Stat. tit. 12, § 2414. The distinction is trivial, as both are subject to the same balancing test. *See Horn v. Oklahoma*, 204 P.3d 777, 786 (Okla. Crim. App. 2009).

The Tenth Circuit has held Federal Rule of Evidence 414, upon which §
2414 was patterned, to be facially constitutional. *See James v. Martin*, 567 F.
App'x 594, 597 (10th Cir. 2014) (noting that Okla. Stat. tit. 12, §§ 2413 and
2414 are "patterned after Federal Rules of Evidence 413 and 414"); *United
States v. Castillo*, 140 F.3d 874, 880 (10th Cir. 1998) (holding "that Rule 414
does not on its face violate the Due Process Clause"). And, the "Supreme
Court has not issued a decision that questions the constitutionality" of
Oklahoma's propensity statutes. *Brushwood v. Franklin*, No. CIV-12-193-R,
2012 WL 3887016, at *3 (W.D. Okla. Aug. 13, 2012) (unpublished report and
recommendation) (finding that "[i]n the absence of clearly established federal
law on the issue, the Court should reject the habeas claim [challenging the
propensity statute's constitutionality on its face]"), *adopted*, 2012 WL
4327039 (W.D. Okla. Sept. 20, 2012) (unpublished order), *certificate of
appealability denied*, 510 F. App'x 771 (10th Cir. 2013). So, the undersigned
finds no grounds for habeas relief in Petitioner's facial constitutional
challenge to Okla. Stat. tit. 12, § 2414. *See id.*; *see also*, *e.g.*, *Burke v. Rudek*,
483 F. App'x 516, 518 (10th Cir. 2012) (affirming the district court's denial of
habeas relief on petitioner's facial challenge to Okla. Stat. tit. 12, § 2413 – the
statute nearly identical to § 2414 – on grounds that the "court has rejected a
similar due process challenge to Fed. R. Evid. 413").

### 3. The trial court's alleged failure to sufficiently examine the propensity evidence.

Petitioner next complains that the trial court violated his rights when the judge failed to hold an evidentiary hearing to conduct a "vigorous examination of the proposed evidence." (internal quotations marks omitted). Doc. 22, Att. 1, at 16-22. On direct appeal, the OCCA held that the trial court had "substantially complied with the requirements for the admission of propensity evidence" and denied relief. Doc. 18, Ex. 5, at 2.

Under Oklahoma law, evidence that the State seeks to admit under Okla. Stat. tit. 12, § 2414 must pass the "balancing test" for all relevant evidence. *See Horn*, 204 P.3d at 786. According to the OCCA,

> Trial courts should consider, but not be limited to the following factors: 1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the dangers that admission of propensity evidence poses, the trial court should consider: 1) how likely is it such evidence will contribute to an improperly-based jury verdict; and 2) the extent to which such evidence will distract the jury from the central issues of the trial. Any other matter which the trial court finds relevant may be considered.

*Id.* The OCCA has also noted that if the defendant objects to such evidence, the trial judge should hold an evidentiary hearing to consider these factors. *Id.*

Initially, the undersigned notes that the record belies Petitioner's allegation that the trial court failed to hold a hearing or otherwise engage in the analysis set forth above. That is, the state court judge heard extensive pre-trial arguments regarding the evidence's admissibility. PTR (June 7, 2010), at 103-07; PTR (June 8, 2010), at 4-25. After consideration, the judge ruled that the evidence was "probative of the issue of whether there is a propensity." PTR (June 8, 2010), at 24.[18] More importantly, the question for this Court is not whether the trial court followed Oklahoma law to the letter. Instead, the only question is whether the OCCA reasonably applied *federal* law when it held that the trial court's consideration of whether to admit the evidence, *in and of itself*, did not create a fundamentally unfair trial for Petitioner.

Petitioner provides no legal authority showing that he enjoyed an independent federal due process right in having an evidentiary hearing where

---

[18]     Though the judge did not specifically state that Petitioner's act of open-mouth kissing T.W. constituted a crime, it does. *See* Okla. Stat. tit. 21, § 1123 (establishing that to "look upon, touch, maul, or feel the body or private parts of any child under sixteen (16) years of age in a lewd or lascivious manner" constitutes a lewd act); *Mooney v. Oklahoma*, 273 P.2d 768, 771-72 (Okla. Crim. App. 1954) (noting evidence that defendant had "stuck his tongue in [the minor's] mouth" and holding that "[t]hese acts clearly fall within the second definition of acts constituting the crime against which [Okla. Stat. tit. 21, § 1123] is directed").

the judge made specific rulings on every balancing factor listed above.  And, as discussed below, *see infra* § VII(A)(4), the OCCA reasonably found that the admission of the propensity evidence did not violate due process.  So, the undersigned finds no grounds warranting federal habeas relief in Petitioner's claim that the trial judge failed to precisely follow state law when he considered whether to admit the propensity evidence.

### 4. The propensity evidence's alleged substantially prejudicial effect.

In his third challenge to the propensity evidence, Petitioner argues that it had a substantially prejudicial effect because the State used the evidence to "paint defendant as a child molester."  Doc. 22, Att. 1, at 22.  The OCCA rejected the claim on direct appeal, Doc. 18, Ex. 5, at 2, and the undersigned finds no grounds warranting habeas relief.

By its very nature, § 2414 allows introduction of evidence suggesting that a defendant has a propensity to commit sexual crimes against children. That is, § 2414 evidence, to the extent it proves the State's case against a defendant, is prejudicial.  *See United States v. Bennally,* 500 F.3d 1085, 1093 (10th Cir. 2007) ("The purpose for introducing evidence of Benally's prior sexual assaults was to provide the jury with just such probative propensity evidence."); *United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001) (discussing the admissibility of propensity evidence and noting that "[a]ll

evidence introduced against a criminal defendant might be said to be prejudicial if it tends to prove the prosecution's case"). But "'[e]vidence is not *unfairly* prejudicial simply because it is damaging to [the defendant's] case.'" *United States v. Caraway*, 534 F.3d 1290, 1301 (10th Cir. 2008) (citation omitted; emphasis added). Instead, it is only *unfairly* prejudicial "if it makes 'a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.'" *United States v. McGlothin*, 705 F.3d 1254, 1266 (10th Cir. 2013) (citation omitted).

T.W.'s testimony was brief and, arguably, the only "lewd act" she described included Petitioner's kissing her with an open mouth and tongue. TR Vol. 5, at 571-84. And while Petitioner's attorney expressly rejected a limiting instruction before T.W.'s testimony, *id.* at 569-70, the attorney did cross-examine T.W. *Id.* at 578-83. At the trial's conclusion, the trial judge instructed the jury that they could consider T.W.'s testimony "for its tendency, if any, to show [Petitioner's] predisposition or inclination to engage in acts of child molestation." The trial judge further instructed that the jury "may not . . . convict [Petitioner] solely because you believe he committed these other offenses . . . ." OR at 45 (Instruction No. 12). "A jury is presumed

to follow its instructions." *United States v. Berry*, 717 F.3d 823, 832 (10th Cir. 2013).

Finally, the evidence against Petitioner was overwhelming. *Supra* § III. B.M.'s disclosures remained consistent through several reports, and the jury was able to examine the child's credibility both directly after the events of November 18, 2008 unfolded (in her videotaped CARE interview) and at trial.

Under such circumstances, the undersigned finds no grounds for concluding that T.W.'s propensity evidence testimony was so *unfairly* prejudicial as to render Petitioner's trial fundamentally unfair. *See McGlothin*, 705 F.3d at 1267 (rejecting a claim that propensity evidence violated petitioner's rights, in part because the "evidence is so overwhelming that the [prior acts] had no effect on 'the outcome of the . . . proceedings'" (citation omitted)); *Benally*, 500 F.3d at 1093 ("[A]ny jury bias that may have resulted from the district court's decision to admit this evidence would have been mitigated by the court's two separate instructions to the jury regarding the jury's permissible and impermissible uses of the [propensity] evidence."); *Enjady*, 134 F.3d at 1434 (holding that propensity evidence was not unfairly prejudicial in light of defendant's "opportunity to investigate and prepare," to "effectively cross-examine[]" the witness, and to establish "an inconsistency"

through recall of a witness).  Because the OCCA's finding on this claim was reasonable, the undersigned recommends that the court deny habeas relief.

### 5. The trial court's jury instruction regarding the propensity evidence.

In his final challenge to the propensity evidence, Petitioner claims that the trial court's instruction did not "adequately guide the discretion of the jury."  Doc. 22, Att. 1, at 23-24.  In particular, Petitioner argues that the trial court instructed the jury that they heard evidence that he "<u>may have</u>" committed another offense — not that he "<u>actually did</u>" — and this gave the jury permission to "consider mere accusations of molestation in its deliberations."  *Id.* at 23 (quoting Jury Instruction No. 12, OR at 45) (emphases added by Petitioner).  He also argues that the jury's consideration of "mere accusations" allowed them to "wipe out any reasonable doubt concerning the charged offenses."  *Id.* at 24.

The trial court's instruction read:

> You have heard evidence that the defendant may have committed other offenses of child molestation in addition to the offenses charged in the information.  You may consider this evidence for its tendency, if any, to show the defendant's predisposition or inclination to engage in acts of child molestation.  This evidence of predisposition or inclination to engage in acts of child molestation is to be considered by you along with all of the other evidence and given the weight, if any, you deem appropriate in reaching your verdict.  You may not, however, convict the defendant solely because you believe he committed these other offenses or solely because you believe he is predisposed or inclined to engage in acts of child molestation.

The prosecution's burden of proof to establish the defendant's guilt beyond a reasonable doubt remains as to each and every element of each offense[] charged.

OR at 45 (Instruction No. 12). On direct appeal, the OCCA found that this instruction was proper and "was taken verbatim from the instruction quoted with approval in [a published OCCA case]." Doc. 18, Ex. 5, at 2 & n.4.

As with the admission of evidence, "[a] jury instruction, even if erroneous, is not constitutionally defective 'unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense or is otherwise constitutionally objectionable as, for example, by transgressing the constitutionally rooted presumption of innocence.'" *Webber v. Scott*, 390 F.3d 1169, 1180 (10th Cir. 2004) (citation omitted). Here, because the OCCA held that the instruction was proper under Oklahoma law, the court should find that the instruction did not result in fundamental unfairness to Petitioner. *See Parker v. Scott*, 394 F.3d 1302, 1318-19 (10th Cir. 2005) (rejecting a habeas claim involving error in jury instructions because federal courts "must accept [the OCCA's] interpretation of state law"); *see also Kidwell v. Martin*, No. 08-CV-0596-CVE-FHM, 2012 WL 707040, at *6 (N.D. Okla. Mar. 5, 2012) (unpublished order) (denying habeas relief in part "[b]ecause the OCCA determined that the jury instruction complied with Oklahoma law, [and] this Court is bound by the

OCCA's interpretation of the Oklahoma law"), *certificate of appealability denied*, 480 F. App'x 929 (10th Cir. 2012).

Additionally, the undersigned finds no merit in Petitioner's suggestion that the instruction deprived him of a fundamentally fair trial. As addressed above: (1) the propensity statutes are facially constitutional, (2) Petitioner's alleged conduct with T.W. constituted a "lewd act" under Oklahoma law, and (3) the evidence's admission was not overly prejudicial. Further, the trial court's instruction properly informed jurors that: (1) they could consider the propensity evidence but that they could not convict Petitioner for that alleged crime, and (2) the propensity evidence did not negate the State's duty to prove every element beyond a reasonable doubt. So, again, the undersigned finds that the OCCA's rejection of this claim was a reasonable application of federal law.

**B.    Petitioner's claims involving other evidentiary rulings.**

In his second proposition, Petitioner challenges the trial court's admission and exclusion of evidence at trial, and argues that each individual error "had significant impact" and "[w]hen viewed together, the effect was overwhelming." Doc. 22, Att. 1, at 24.

Petitioner first focuses on the trial court's exclusion of evidence that: (1) B.M. was singing the "'Get a new daddy' song"; (2) Ms. Williamson

continued a sexual relationship with Petitioner after November 18, 2008; (3) Jeff White believed that B.M. "had probably seen videotapes of an intimate nature"; (4) B.M. "often masturbated"; and (5) Dr. Richard Kishur performed a psychological evaluation and believed that Petitioner's "makeup was not consistent with a child abuser profile." *Id.* at 24-30.

Petitioner then shifts his challenge to evidence which the trial court admitted, including: (1) T.W.'s testimony; (2) child-hearsay statements; (3) *res gestae* evidence; (4) "graphic pictures"; and (5) "sex tapes." *Id.* at 31-35.

On direct appeal, the OCCA found that the trial court committed no error in excluding Petitioner's evidence, with the exception of proffered evidence about B.M.'s singing the words "Get a New Daddy." Doc. 18, Ex. 5, at 4. The OCCA held, however, that the exclusion did not materially affect the trial's outcome. *Id.* at 4-5. The OCCA then held that the evidence the trial court did admit was "relevant and proper." *Id.* at 5. The undersigned finds that the OCCA reasonably applied federal law in rejecting Petitioner's claims.

### 1. Clearly established federal law.

As discussed above, *see supra* § VII(A)(1), to warrant habeas relief on claims involving erroneous state evidentiary rulings, Petitioner must establish that the rulings were so grossly prejudicial that they fatally infected

the trial and denied him fundamental fairness. *Hooks*, 689 F.3d at 1180. Additionally, because Petitioner raised his direct appeal claims under this due process standard, Doc. 18, Ex. 1, at 22-30, the undersigned assumes that the OCCA denied the claims on those merits. *See Harrington*, 131 S. Ct. at 784-85.

### 2. The evidence the trial court excluded.

### a. The "Get a new daddy" song.

Petitioner called Jeff White as a witness. TR Vol. 6, at 731. Before Mr. White took the stand, the State objected on grounds that Petitioner's notice suggested that Mr. White would testify that he heard B.M. singing a song called "Get a new daddy." *Id.* The trial court ruled that such testimony would be hearsay, and that he would not allow it. *Id.*

After his conviction, Petitioner moved for a new trial and argued in part that the court's suppression of this testimony was in error. Supp. OR at 105-08. In that motion, Petitioner documented the lyrics to "Get a new daddy song" as:

> Hey there kids I see you're feelin' blue
>
> Parents push you 'round and tell you what to do
> Dad makes you clean your room and go to bed
> Instead of watchin' TV you have to do homework instead
> And I know it makes you angry
> And you're full of rage
>
> Well let me tell you a secret I wish I knew when I was your age

Next time you're angry and you wanna fight back
Just tell your teacher Daddy likes to play with your sack

And you can get a new daddy
Get a New Daddy
Police'll take the old one away in a caddy
You can get a new daddy
Get a New Daddy
Stay up real late
Kick back and light up a fatty

You can Get a New Daddy
Get a New Daddy
In a couple of months you'll probably get a new daddy

Get a New Daddy
Get a New Daddy
In a couple of months you'll probably get a new daddy

Now for a little while your new daddy's cool
Buys you things and tries real hard to bond with you
Lets you eat candy and play video games
But your friends at school all think that he's kind of lame
Now you can't have your buddies makin' fun of your dad
And all in all this one was really not so bad
But you think you'd might like to try once more
Take naked Polaroid's of yourself and leave them in his sock drawer

And you can get a new daddy
Get a New Daddy
Stay up real late
Kick back and light up a fatty

You can get a new daddy
Get a New Daddy
Police'll take the old one away in a caddy

You can Get a New Daddy
Get a New Daddy
In a couple of months you'll probably get a new daddy

Get a New Daddy
Get a New Daddy
In a couple of months you'll probably get a new daddy
Now your mom's wondering what's wrong with her
And why she keeps attracting men that are dirty pervs
She has a breakdown and cries and cries
And after a while she's institutionalized

You can get a new mommy
Get a New Mommy
New brother and sister
A New house, A New Mommy

Get a new mommy
Get a new daddy
Stay up real late
Kick back and spark up a fatty

You can get a new daddy
Get a New Daddy
Police'll take the old one away in a caddy

You can Get a New Daddy
Get a New Mommy
A New brother and sister
A New house, A New Mommy

Get a New Mommy
Get a New Daddy
Stay up real late
Kick back and spark up a fatty

You can Get a New Daddy
Get a New Daddy
In a couple of months you'll probably get a new Daddy

*Id.* at 106-08. According to Petitioner, testimony that B.M. had been

overheard singing the phrase "get a new daddy" was crucial to support his

theory that B.M. had fabricated her allegations in response to Petitioner's strict discipline. *Id.*; *see also* TR Motion for New Trial, at 26-27, 33, 36-38.

As discussed above, the OCCA agreed that the trial court erred in excluding the testimony. Doc. 18, Ex. 5, at 4. However, the appellate court held that:

> The record shows that the case for bias/motive to fabricate based on hearing the victim utter the words "get a new daddy" is weak without other evidence to show the child knew the lyrics of the actual song with the same title, had seen the YouTube video of that song or that there was some other visible connection between the song and her allegations. *Though it was error to exclude the evidence on the basis of hearsay, we have no "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred.*

*Id.* at 4-5 (emphasis added) (citation omitted). The undersigned finds this to be a reasonable application of federal law.

Petitioner wanted to introduce testimony that Mr. White overheard B.M. sing the phrase "get a new daddy." But, Mr. White did not hear B.M. sing any of the other lyrics and had no personal knowledge that she had ever heard the entire song or seen the video. TR Motion for New Trial, at 46. Further, Petitioner acknowledges that there was already evidence admitted

at trial that he was the "disciplinarian in the household,"[19] and B.M. "was a head strong young girl." *Id.* at 26. Under these circumstances, and in light of the overwhelming evidence of guilt, the undersigned sees no fundamental unfairness and cannot find that the OCCA unreasonably applied federal law when it rejected this claim on the merits.

### b. Evidence of a continued sexual relationship with Amber Williamson.

According to Petitioner, Ms. Williamson testified that she "was afraid" of him, so he wanted to elicit testimony that she had attempted to rekindle an intimate relationship with him after November 18, 2008. Doc. 22, Att. 1, at 27. Petitioner claims that the trial court refused to allow the question, and that the ruling prevented him from putting on a defense. *Id.* The record does not support Petitioner's assertion.

Notably, Petitioner's attorney questioned Ms. Williamson about her alleged ongoing sexual relationship with Petitioner *before* she ever testified to being afraid of him. TR Vol. 3, at 318. That is, Petitioner's attorney asked Ms. Williamson if she believed B.M., and when she said yes, the attorney asked her if she had been having an ongoing sexual relationship with

---

[19] Ms. Williamson testified that Petitioner was the primary disciplinarian and was "very strict." TR Vol. 3, at 255.

Petitioner. *Id.* After lengthy arguments, the trial court agreed to let Ms. Williamson answer the question. *Id.* at 334. So, Petitioner's attorney repeated: "Ma'am, isn't it true that you have had sexual intercourse with Mr. Williamson on a regular basis over the last six months?" *Id.* Ms. Williamson stated: "That is not true. I have had intercourse with him but it's been quite some time." *Id.* at 335.

On re-direct examination, the State asked Ms. Williamson if Petitioner intimidated or made her afraid, and she answered "Yes." *Id.* at 365. On re-cross-examination, Petitioner's attorney asked: "You're afraid of Mr. Williamson that's why you've been . . . you go to his house and have sex?" *Id.* The trial court allowed Ms. Williamson to respond, and she testified that "It's better to keep your friends close, you keep your enemies closer." *Id.* at 366. Petitioner's attorney continued to question the witness about her sexual relationship with Petitioner, and she continued to answer. *Id.* at 366-67. Finally, Ms. Williamson explained, "I felt like I was keeping us safer to have that kind of relationship with him, but did I still have feelings of love with him? Honestly, yes I did. Love is not a switch that you can turn off." *Id.* at 367. The trial court then asked the attorneys to approach and stated: "Let's be done with this issue. We've beat this horse. . . . Stop. That's it." *Id.* at 368.

On direct appeal, the OCCA found that the trial court had in fact allowed Petitioner to introduce evidence that he and Ms. Williamson had continued a sexual relationship, Doc. 18, Ex. 5, at 3. Based on the foregoing, the undersigned agrees. The record simply does not support Petitioner's argument otherwise, and the undersigned finds that the OCCA reasonably rejected this claim on appeal.

> ### c. Evidence that B.M. had "probably" seen Petitioner and Ms. Williamson's sexual video tapes.

Petitioner further complains that the trial court improperly excluded Mr. White's testimony that B.M. had "probably seen videotapes of an intimate nature." Doc. 22, Att. 1, at 28. According to Petitioner, such "evidence would have been used to demonstrate that the alleged victim's familiarity with sexual details did not come from the contacts with [Petitioner] but rather from other causes." *Id.* Like the previous argument, the record does not support Petitioner's claim.

Ms. Williamson and Petitioner both testified that they had recorded their sexual activity. TR Vol. 3, at 314-15; *id.* Vol. 6, at 656. Although Ms. Williamson stated that the videos were locked away, *Id.* Vol. 3, at 315-16, Petitioner testified that the videos were sometimes left "sitting right beside the dresser." *Id.* Vol. 6, at 657. Mr. White testified that he had once been at

Petitioner's house when Petitioner "came out of the bedroom and was kind of distraught and mad at the same time" because of "[s]ome videotapes being left out." *Id.* at 734-35. The only statement that the trial court excluded was Mr. White's speculation that the tapes Petitioner had been referring to had been the relevant sex tapes. *Id.* at 735-36. Under such circumstances, the undersigned finds that the OCCA reasonably found no fundamental unfairness.

### d. Evidence that B.M. "often masturbated."

Petitioner testified that B.M. had been masturbating in the bath on November 18, 2008, and that Ms. Williamson had actually overheard him reprimanding her. *Id.* at 639-40; *id.* Vol. 7, at 847-48. Petitioner wanted to introduce further evidence that B.M. "often masturbated," and Petitioner believes that the trial court "refus[ed] to allow this evidence" under the rape-shield law. Doc. 22, Att. 1, at 29 (citing Okla. Stat. tit. 12, § 2412). But the record reflects that the trial court *allowed* the evidence from both Petitioner and Ms. Williamson.

The trial judge heard extensive arguments regarding whether testimony that B.M. masturbated was inadmissible under Oklahoma's "rape shield" law. PTR (June 7, 2010), at 111-15; TR Vol. 2, at 38-47. Ultimately, the judge announced that Petitioner could ask Ms. Williamson about B.M.'s

alleged propensity to masturbate. TR Vol. 2, at 44-47. And, when Petitioner's attorney questioned Ms. Williamson, she recalled an occasion when B.M. had been seen masturbating. *Id.* Vol. 3, at 346. As noted above, Petitioner himself testified that B.M. had been masturbating on November 18, 2008. *Id.* Vol. 6, at 639-40.

Later, Petitioner's brother testified: "Well, I can give you one simple example of how [Petitioner] disciplined children. I was once in the truck with [Petitioner] and Amber and [B.M.] and noticed, you know, [B.M.] was in the back seat masturbating and [Petitioner] – ." *Id.* The State interrupted with an objection and the trial judge ruled: "I don't want to hear anything more about this child and her sexual habits." *Id.* The trial court then instructed the jury to disregard the witness's statement. *Id.* at 749.

Because the record reflects that the trial court *allowed* the evidence from both Petitioner and Ms. Williamson, and further testimony would have been only cumulative, the OCCA reasonably found no fundamental unfairness in the trial court's refusal to allow Petitioner's brother to testify about B.M.'s alleged masturbation habits. *See, e.g., Young v. Workman*, 383 F.3d 1233, 1238 (10th Cir. 2004) (holding there was no fundamental unfairness in the limitation of testimony which "would [not] be anything more than cumulative").

### e. Dr. Kishur's opinion that Petitioner is not a pedophile.

Finally, Petitioner claims fundamental unfairness in the trial court's exclusion of Dr. Richard Kishur's testimony. Doc. 22, Att. 1, at 30-31. At trial, Petitioner's attorney informed the trial judge that:

> [I]f Dr. Kishur were to testify he would testify that he has conducted an in-take on the [Petitioner] in this case and that with his history and background and his expertise that he would qualify as an expert and that his expert testimony and his opinion on the case is going to be that [Petitioner] does not have propensity to be a pedophile.

TR Vol. 6, at 784. After argument, *id.* at 783-86, the trial court excluded the testimony on grounds that it "invades the province of the jury." *Id.* at 784.

The OCCA affirmed on this point, holding that "[Petitioner] fails to cite any authority for the admission of an expert opinion that the *defendant* who is on trial for sex crimes against a child *is or is not* a pedophile." Doc. 18, Ex. 5, at 3. The OCCA held "that the district court did not err in excluding the testimony of the expert witness, because such testimony was not necessary to assist the trier of fact and invaded the province of the jury." *Id.* at 4.

The undersigned finds that in light of the OCCA's holding that the evidence was properly excluded under Oklahoma law, Petitioner cannot show any error, and thus cannot establish fundamental error. Further, the undersigned finds no fundamental unfairness in the trial court's disallowing

Dr. Kishur's opinion. *See, e.g., Bowen v. Haney*, 622 F. Supp. 2d 516, 543 (W.D. Ky. 2008) ("[T]he determination by the trial court that the pedophile profile expert testimony of Dr. Gardner was not relevant in the sense of meaningfully helping the jury determine whether or not Petitioner . . . sexually abused or sodomized J.S. was not an error of state evidence law, much less an error so egregious as to implicate the Petitioner's right to a fundamentally fair trial."). So, the court should deny habeas relief on this point.

### 3. The evidence the trial court admitted.

#### a. T.W.'s testimony.

In his first challenge to the trial court's alleged improper admission of evidence, Petitioner re-urges the prejudicial effect of T.W.'s propensity evidence testimony combined with the jury's alleged lack of instruction. Doc. 22, Att. 1, at 31-32. The undersigned has already addressed this argument, *see supra* § VII(A)(4)-(5), and for the reasons discussed there, finds that the trial court properly admitted the evidence under state law and thus did not violate Petitioner's due process rights. And, the undersigned has already found that, in light of the overwhelming evidence against Petitioner, the OCCA reasonably concluded that T.W.'s testimony did not violate Petitioner's

due process rights. *See id.* So, the undersigned finds no grounds for habeas relief in Petitioner's re-urged argument.

### b. Admission of child-hearsay statements.

The trial court allowed several witnesses to testify regarding statements that B.M. made about Petitioner's abuse. Petitioner acknowledges that such testimony is permitted under Okla. Stat. tit. 12, § 2803.1 if the trial court finds the statements reliable. However, Petitioner argues that B.M.'s statements were *not* reliable because: (1) she "was subject to tampering and coaching," (2) she "spent [time] in the sole custody of her mother" who "stands to gain financially from [Petitioner's] conviction," and (3) interviewers "have a natural bias to believe an alleged victim." Doc. 22, Att. 1, at 32-33.

The trial court held a pre-trial hearing before deciding to admit the child-hearsay statements. PTR (June 7, 2010), at 7-101. There, Petitioner's attorney raised his concerns through cross-examination of most of the witnesses, including Ms. Williamson, Ms. Bowers, and Ms. Johnson, and through arguments to the trial court. *Id.* at 21-45, 61-71, 83-90, 94-97. Ultimately, the judge held that B.M.'s statements were "made fairly contemporaneous" to the alleged abuse, were "consistent" and included

"similar events," and "have sufficient indicia of reliability and trustworthiness." *Id.* at 100-01.

On direct appeal, the OCCA held that the trial court did not error in admitting the child-hearsay statements, Doc. 18, Ex. 5, at 5, and the undersigned notes that the trial court's findings support admissibility under Oklahoma law. *See* Okla. Stat. tit. 12, § 2803.1 (providing in part that a child's statements concerning sexual abuse may be admitted if the "content and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy"). Additionally, Petitioner thoroughly cross-examined every child-hearsay witness to expose potential aspects of unreliability. TR Vol. 3, at 316-58 (Ms. Williamson); *id.* Vol. 5, at 421-31, 438-39 (Ms. Sanders), 492-98 (Ms. Bowers), 508-512 (Ms. Johnson). In sum, Petitioner offers this Court nothing more than his original concerns, all of which the trial court and the OCCA considered.

Under these circumstances, the undersigned finds that the admission of the child-hearsay evidence did not violate Petitioner's due process rights, and the OCCA reasonably rejected Petitioner's constitutional claim.

### c. Res gestae evidence.

According to Petitioner, the trial court "allowed a significant amount of evidence to be heard by the jury under the guise of the *res gestae* rule." Doc. 22, Att. 1, at 33-34. But as on direct appeal, Petitioner fails to cite any specific "res gestae" evidence that the trial court improperly admitted. *Id.* The OCCA refused to address the issue on that ground, Doc. 18, Ex. 5, at 5, and the undersigned likewise finds it impossible to conduct any meaningful review over this conclusory assertion. *See Moore v. Gibson*, 195 F.3d 1152, 1180 n.17 (10th Cir. 1999) (acknowledging that petitioner raised a habeas claim with no argument or support and holding that: "We do not consider unsupported and undeveloped issues."); *Kirby v. Att'y Gen. ex rel N.M.*, No. 11-2082, 2011 WL 4346849, at *5 (10th Cir. Sept. 19, 2011) (unpublished slip op.) ("Mr. Kirby's conclusory assertion that his due-process rights were violated − without any factual foundation or legal analysis to support his claim − does not entitle him to relief.").

### d. Introduction of "graphic pictures."

B.M. testified that Petitioner had shown her pictures of "naked people" and "people having sex" on a computer. TR Vol. 2, at 119-20. Police found several pornographic images on Petitioner's computer, and the State introduced those pictures into evidence. *Id.* Vol. 5, at 520-22 & State's Exs.

19-21. Petitioner claims to not understand the photographs' relevance and argues that the pictures were "far more prejudicial than probative." Doc. 22, Att. 1, at 34-35. The OCCA disagreed on direct appeal, holding that the "district court did not err in admitting . . . the photographs taken from the family computer because the evidence was relevant and proper." Doc. 18, Ex. 5, at 5.

Under Oklahoma law, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable . . . than it would be without the evidence." Okla. Stat. tit. 12, § 2401. As just discussed, B.M. testified that Petitioner showed her pornographic photos from the computer, and police found pornographic photographs on the family computer. The pictures were therefore relevant because they had a tendency to prove that Petitioner showed B.M. the images.

Further, even if the photographs were prejudicial, Petitioner cannot show that they rendered his trial fundamentally unfair. Ms. Williamson acknowledged that the entire family used the computer, and B.M. agreed. TR Vol. 3, at 290-91, 190-91. B.M. also explained that she thought her brother had once been in trouble because someone had typed "sex" into the internet search bar. *Id.* at 192-93. So, the jury could have inferred that the

photographs came from any family member. Finally, even without the photographs, there was overwhelming evidence of Petitioner's guilt. Under such circumstances, the undersigned cannot say that the OCCA unreasonably applied federal law when it rejected Petitioner's due process claim.

### e. The alleged admission of the "sex tapes."

In Petitioner's final challenge to the trial court's admission of evidence, he claims that the court "allowed the State to introduce tapes of defendant and his wife having sex." Doc. 22, Att. 1, at 35. As with some of Petitioner's other arguments, the record belies his claim. The State did *not* introduce the sex tapes, and Petitioner's attorney acknowledged this in closing argument. TR Vol. 7, at 875 ("And did the sex tapes come into evidence as an exhibit for you to watch? No."). Accordingly, the undersigned finds no grounds to warrant habeas relief.

### C. Petitioner's claim involving trial counsel's ineffective assistance.

Petitioner challenges his trial counsel's constitutional effectiveness, alleging that the attorney failed to: (1) take advantage of a preliminary hearing to further investigate the claims, (2) interview and investigate propensity witnesses, and (3) sufficiently challenge the propensity evidence's admission. Doc. 22, Att. 1, at 36-43. The OCCA held that Petitioner had shown "neither that trial counsel was ineffective at trial or in his

investigation nor that there is a reasonable probability that the outcome of his trial would have been different had trial counsel handled his case differently." Doc. 18, Ex. 5, at 5-6. The undersigned finds this decision reasonable.

### 1. Clearly established law.

For claims involving counsel's ineffective assistance, the Supreme Court "clearly established" federal law in *Strickland v. Washington*, 466 U.S. 668 (1984). There the Court held that a petitioner must show that the attorney's performance was constitutionally deficient and prejudicial. *Id.* at 690-91. The court will only consider an attorney's performance "deficient" if it falls "outside the wide range of professionally competent assistance." *Id.* at 690. "[P]rejudice" involves "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### 2. Analysis.

#### a. The attorney's preliminary hearing waiver.

Petitioner first argues that his attorney was ineffective for waiving preliminary hearing and thus giving up the opportunity to "learn . . . all he could about the 'facts of the case.'" Doc. 22, Att. 1, at 40. Petitioner speculates that with a preliminary hearing, the attorney could have:

(1) "tested lines of questioning and theories of defense," (2) "had a transcript to review and prepare for [trial]," and (3) discovered "if Petitioner's situation was hopeless." *Id.*

As Respondent argues, Petitioner's attorney filed numerous pre-trial motions, each indicating familiarity with the evidence and the underlying facts of the case. Doc. 18, at 48 (citing OR 13-14, 18-19, 20). Petitioner's attorney also participated in several pre-trial and in-camera hearings involving the admissibility of evidence. PTR (June 3, 2010) *passim*; PTR (June 7, 2010) *passim*; PTR (June 8, 2010) *passim*; TR Vol. 1 *passim*; *id.* Vol. 2, at 38-47. The attorney's motions and arguments belie Petitioner's suggestion that counsel needed a preliminary hearing to learn about the facts of the case. Additionally, the evidence Petitioner's attorney challenged before trial – particularly the child-hearsay testimony – provided the bulk of the overwhelming evidence that convicted Petitioner. So, Petitioner would have been able to decide before trial whether his case was, as he states, "hopeless." Doc. 22, Att. 1, at 40.

Under these circumstances, the OCCA could have reasonably found that the attorney's conduct did not fall "outside the wide range of professionally competent assistance," and that there was not a reasonable probability that but for the attorney's preliminary hearing waiver,

Petitioner's trial result "would have been different." *Strickland*, 466 U.S. at 690, 694. So, the undersigned recommends that the court deny habeas relief on this claim. *See Van Dusen v. Mullin*, No. CIV-06-295-M, 2006 WL 3693368, at *4 (W.D. Okla. Dec. 14, 2006) (unpublished order) (denying habeas relief on grounds that petitioner failed to show that counsel's preliminary hearing waiver was either deficient or prejudicial), *certificate of appealability denied*, *Dusen v. Sirmons*, 242 F. App'x 562 (10th Cir. 2007).

### b. The attorney's alleged failure to interview T.W. and Petitioner's ex-wife before trial.

Petitioner next argues that if his attorney had interviewed T.W. and Petitioner's ex-wife before trial, he "might" have uncovered bias or longstanding resentments due to the divorce and "might" have discovered evidence that T.W.'s mother had coached T.W.'s testimony. Doc. 22, Att. 1, at 42. Petitioner also suggests that one "possibly fruitful" question would have been why T.W.'s mother did not report T.W.'s alleged abuse. *Id.* Finally, Petitioner "freely concedes" that the trial attorney may have made a strategic decision not to cross-examine his ex-wife, but Petitioner finds the failure ineffective nevertheless. *Id.* As before, the undersigned finds that the OCCA reasonably applied *Strickland* in rejecting these allegations on direct appeal.

A petitioner's speculation regarding what an investigation would have revealed is insufficient to establish prejudice under *Strickland*. *See Hendrix*

*v. Trammell*, 576 F. App'x 767, 770 (10th Cir. 2014) (affirming the district court's rejection of petitioner's ineffective assistance of counsel claim that was supported by only "'pure speculation'" (citation omitted)); *United States v. Howell*, 573 F. App'x 795, 799 (10th Cir. 2014) (affirming the district court's denial of petitioner's claim that counsel was ineffective for failing to investigate before trial, and holding that petitioner's "speculation" regarding the potential outcome of the investigation "does not meet the required showing of 'a reasonable probability that . . . the result of the proceeding would have been different.'" (citation omitted)).

As noted, Petitioner himself "freely concedes" that his attorney's decision not to cross-examine T.W.'s mother – potentially opening the door to more damaging abuse examples – "might have been a strategic one." Doc. 22, Att. 1, at 42. "Trial strategy includes determining how best to cross-examine witnesses." *Pickens v. Gibson*, 206 F.3d 988, 1002 (10th Cir. 2010). As such, an attorney's decision regarding cross-examination is "'virtually unchallengeable.'" *Kessler v. Cline*, 335 F. App'x 768, 770 (10th Cir. 2009) (citation omitted). In sum, Petitioner's speculations fail to establish that the OCCA unreasonably applied *Strickland* when it rejected these arguments on the merits.

### c. The attorney's alleged failure to "fully develop legal issues."

Finally, Petitioner claims that his attorney failed to sufficiently challenge the propensity evidence because he did not present his argument as a "Constitutional objection based on the due process clause." Doc. 22, Att. 1, at 43. The OCCA found no deficiency or prejudice in the attorney's conduct, and the undersigned finds this to be a reasonable *Strickland* application. Doc. 18, Ex. 5, at 5-6.

Petitioner's attorney made extensive objections to the propensity evidence. PTR (June 8, 2010) *passim*. And, as discussed above, *supra* § VII(A)(1)-(5), the trial court's admission of propensity evidence did not violate Petitioner's federal constitutional rights. So, the undersigned finds no reasonable probability that the outcome of Petitioner's trial would have been different had trial counsel specifically couched his arguments to implicate the Federal Constitution. The OCCA clearly applied *Strickland* reasonably, and the undersigned recommends that the court deny habeas relief on this ground.

### D. Petitioner's claim involving the evidence's sufficiency.

In his final argument, Petitioner alleges that the evidence was insufficient to establish his guilt in Count One because the State failed to "prove the sexual gratification element." Doc. 22, Att. 1, at 44-46. The OCCA

disagreed, holding that "[t]he evidence, viewed in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt that Williamson exposed himself for the purpose of receiving sexual gratification."  Doc. 18, Ex. 5, at 6.  The undersigned finds no grounds meriting habeas relief.

### 1.    Clearly established law.

The United States Supreme Court clearly established the constitutional right to sufficient evidence of guilt in *Jackson v. Virginia*. 443 U.S. 307, 324 (1979); *see Lott v. Trammell*, 705 F.3d 1167, 1219 (10th Cir. 2013) (agreeing that *Jackson* provided "the clearly established law applicable to [an insufficient evidence] claim").  Under this decision, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The standard for evidence sufficiency "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.* at 324 n.16.

### 2.    Count One – lewd acts with a child.

In Count One, the State alleged that Petitioner committed lewd acts by "exposing his penis to B.M. and asking her if she wants to learn more."  OR at 1 (all-capitalization omitted).  To convict Petitioner, the State had to prove

49

that he, in "a lewd and lascivious manner and for the purpose of sexual gratification," required B.M. to look upon his "private parts." Okla. Stat. tit. 21, § 1123(5)(c); OUJI-CR 4-129. As noted above, Petitioner alleges a lack of evidence to prove "sexual gratification." Doc. 22, Att. 1, at 44-46.

There was overwhelming evidence at trial that Petitioner: (1) licked B.M.'s vagina, (2) masturbated to ejaculation in front of her, (3) had B.M. masturbate him to ejaculation, (4) put her mouth on his penis, and (5) made B.M. touch his penis. Petitioner also asked B.M. if she would like to learn about sex. When considered in sum, any rational juror could have found beyond a reasonable doubt that when Petitioner showed B.M. his penis and asked if she wanted to learn more, that he was doing so for his own sexual gratification. So, Petitioner has failed to demonstrate that the OCCA *unreasonably* applied *Jackson* when it found sufficient evidence to convict Petitioner in Count One.

## VIII. Recommended ruling and notice of right to object.

For the reasons discussed above, the undersigned recommends that the court deny the petition for habeas relief.

The undersigned advises the parties of their right to object to this report and recommendation by the 4th day of March, 2015, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned

further advises the parties that failure to make timely objection to this report and recommendation waives their right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This report and recommendation disposes of all issues referred to the undersigned Magistrate Judge in this matter.

Entered this 12th day of February, 2015.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE